**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES HUBBARD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 12 C 03426 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Charles Hubbard filed his one-count complaint[1] against Abbott Laboratories ("Abbott")

alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e *et seq.*[2] (Dkt. 1.) Presently before this court is Abbott's motion for summary

judgment. (Dkt. 23.) For the following reasons, Abbott's motion is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

and assess the proof as presented in depositions, answers to interrogatories, admissions, and

---

[1] When Hubbard filed his complaint he was represented by counsel. His counsel withdrew before Abbott Laboratories filed its motion for summary judgment (dkt. 15) so Hubbard filed his responsive briefs and statements *pro se*.

[2] This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper in this district under 28 U.S.C. § 1391(b). Hubbard exhausted his administrative remedies. Although Abbott does not reference this in its brief in support of its summary judgment motion, Hubbard appears to have filed his complaint in this court on day 91 after receiving notice of his right to sue (dkt. 1), not within the 90 days mandated by Title VII. *See* 42 U.S.C. § 2000e-5(f)(1); *Conner* v. *Ill. Dep't of Nat'l Res.*, 413 F.3d 675, 680 (7th Cir. 2005). Regardless, exhaustion is not a jurisdictional prerequisite and the court will consider his claims on the merits.

affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes (1963 amend.). While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## BACKGROUND

### I. Local Rule 56.1 Statement

Local Rule 56.1 requires that a party seeking summary judgment submit a statement of undisputed material facts that support judgment in its favor as a matter of law. N.D. Ill. L.R. 56.1(a). The party opposing the motion must then submit a response addressing each numbered paragraph in the moving party's statement. N.D. Ill. L.R. 56.1(b)(3). Should the party opposing the motion disagree with any of the moving party's statements of facts, the opposing party must support that disagreement with "specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" N.D. Ill. L.R. 56.1(b)(3)(B). In other words, the opposing party may not simply deny the facts presented by the moving party; it must instead cite "specific evidentiary materials justifying the denial." *Phillips* v. *Argosy Univ.*, No. 09 C 6836, 2012 WL 469966, at *1 (N.D. Ill. Feb. 13, 2012) (quoting *Malec* v. *Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000)). Although "it is appropriate to apply [Local Rule 56.1] less strictly to *pro se* pleadings

. . . a *pro se* litigant is not completely excused from the requirements of Local Rule 56.1."

*Lumpkins-Benford* v. *Allstate Ins. Co.*, No. 11 C 6547, 2013 WL 5952168, at *1 (N.D. Ill.

Nov. 5, 2013). The court may limit its analysis of the undisputed facts on summary judgment to

evidence "properly identified and supported in the parties' statements." *Bordelon* v. *Chicago*

*School Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

Hubbard filed his Local Rule 56.1(b) statement (dkt. 30), disputing roughly one-third of

the 80 numbered paragraphs in Abbott's Local Rule 56.1(a) statement. (Dkt. 25.) For all but

one of those disputed responses, however, Hubbard fails to cite to the record.[3] (*See generally*

dkt. 30.) This is despite being directed by the court to comply with Local Rule 56.1(b) and

warned that "Hubbard must support factual statements that he makes with citations to deposition

testimony, an affidavit made under oath, or documentary evidence. . . ." (Dkt. 26.) Hubbard was

similarly warned of this by Abbott. (Dkt. 27.) In light of Hubbard's *pro se* status, the court

construes his submission "generously, but where [Abbott's] proposed facts are adequately

supported by the record and not effectively challenged, they are presumed true." *Phillips*, 2012

WL 469966, at *1. Thus, the following facts are taken from the parties' properly supported

Local Rule 56.1 statements of facts and construed in the light most favorable to Hubbard. *See*

*Gawley* v. *Ind. Univ.*, 276 F.3d 301, 305 (7th Cir. 2001). The court credits Hubbard's version of

the events to the extent that it can find record support for them, and it does not credit those

statements that are inconsistent with the record or insufficiently supported.

---

[3] Hubbard cites to his deposition in response to Abbott's allegations in paragraph 40 of its Local
Rule 56.1 statement. (Pl. N.D. Ill. L.R. 56.1 ¶ 4.)

Hubbard also submitted his own version of the facts in his "Memorandum of Points and Authorities" (dkt. 29),[4] which the court will generously read as a Local Rule 56.1(b)(3)(C) statement. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("[A] concise response to the movant's statement shall contain . . . a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon."). While this version of the facts contradicts some of the facts as laid out by Abbott, it contains very few citations to the record. Pursuant to Local Rule 56.1(b)(3)(C), Abbott submitted its response to those of Hubbard's assertions that he supported with citations to the record. (Dkt. 34.) To the extent that Hubbard's assertions are adequately supported by the record, the court accepts them as true and includes them in the factual background as needed. The court will disregard the statements in Hubbard's Local Rule 56.1(b)(3)(C) statement that are not supported by the record. *See De* v. *City of Chicago*, 912 F. Supp. 2d 709, 713 (N.D. Ill. 2012).

## II.     Factual Background

### A.     Hubbard's Employment at Abbott

Hubbard identifies as African-American. He began working at Abbott, a pharmaceutical company, in June 1999. The events at issue in this suit occurred in March and April 2010. Until Hubbard's termination from Abbott in 2010, he worked as a filling operator and, at the time of his termination, his title was CMO Production Operator II in Abbott's Diagnostic Division. In this position, Hubbard set up and operated filling equipment used to fill diagnostic reagents.

---

[4] Although Hubbard did not formally cross-move for summary judgment, this memorandum is entitled "Memorandum of Points and Authorities in Support of Plaintiff[']s Motion for Summary Judgment." (Dkt. 29.)

Hubbard's job responsibilities included recognizing and correcting problems with machine operations; reading, understanding, and following manufacturing documentation and instructions; operating within basic operation procedures and product specifications; following standard operating procedures; and escalating significant problems to the appropriate level of personnel. He was also expected to adhere to Abbott's safety guidelines; ensure accurate work order documents; implement and maintain the effectiveness of the quality system; review documentation for accuracy and completeness; and take responsibility for all aspects of work order processing, including product inspections, documentation, and minor equipment adjustments.

Additionally, Hubbard was expected to annually review and comply with Abbott's Code of Business Conduct ("the Code"). The Code requires Abbott employees to understand and meet Abbott's expectations, to conduct themselves honestly and ethically, and to comply with all applicable laws, rules, and regulations. The Code prohibits fraud, deceit, and concealment, and gives Abbott the right to conduct an internal investigation and undertake appropriate disciplinary measures for violations of the Code.

Because Abbott, as a pharmaceutical company, is in a heavily regulated industry, it must ensure that its employees comply with government regulations. It does so by requiring its employees to adhere to internal policies and procedures. Hubbard knew that he worked in a highly regulated industry.

### B.  Manufacturing Process

Abbott's policies and procedures mandate that during the manufacturing process in the Diagnostic Division, production operators such as Hubbard check each piece of equipment and

ingredient used to ensure that they are in accordance with the work order's packing bill of material. Abbott is able to verify that the correct equipment and ingredients are being used because some equipment and ingredients used in the manufacturing process are scanned, creating an electronic record. If proper manufacturing procedures are not followed, the product being manufactured may need to be destroyed. Hubbard was trained and expected to document and certify each step in the manufacturing process.

### C.  Hubbard's Work Performance History

Hubbard's overall score in his 2004 through 2009 performance reviews was consistently "Achieved Expectations," the second highest of four possible ratings. (*See* Dkt. 25, Ex. 2, Hubbard Dep. Exs. 13-18.) In each of those years, Hubbard was commended for certain aspects of his work.[5]

In all of those years, however, Hubbard received lower scores in review categories such as "Quality/Compliance." (*Id.* Hubbard Dep. Exs. 13-18.) In his 2004, 2005, and 2006 performance reviews, Hubbard received the rating of "Partially Achieving Expectations," in Quality/Compliance, which is the second lowest out of four possible ratings. In those three years, he was responsible for four, five, and eight procedural errors, respectively, and contributed to at least one "material destruction order." (*Id.*) His performance reviews stated that he needed

---

[5] *See* Dkt. 25 Hubbard Dep. Ex. 13 (Hubbard "exceeded expectations" in four of fourteen categories); *id.* Hubbard Dep. Ex. 14 (Hubbard commended as "one of the best Cube fillers in the department" in 2005); *id.* Hubbard Dep. Ex. 15 (Hubbard exceeded expectations in 2006 in "adaptability" by "maintain[ing] effectiveness through change"); *id.* Hubbard Dep. Ex. 16 (in 2007 Hubbard had zero material destruction orders and "maintain[ed] a high standard of quality in his own work"); *id.* Hubbard Dep. Ex. 17 (Hubbard "demonstrate[d] an understanding of the Quality Policy through daily activities" in 2008); *id.* Hubbard Dep Ex. 18 (Hubbard exceeded expectations in attendance and teamwork in 2009).

to "pay more attention to paperwork format and requirements" and "adhere to operating procedures." (*Id.*)

His reviews did not improve in subsequent years. In 2007, 2008, and 2009, he received the lowest possible rating for "Quality/Compliance." (*Id.*) He had required over 40 work order corrections in 2007. In both 2008 and in 2009, Hubbard incurred five "non-conformances." His review for 2009 noted that at the beginning of that year he had been "challenged to reduce the number of errors he incurred" but he had not been "able to overcome this challenge and did not achieve the quality goal in 2009." (*Id.* Hubbard Dep. Ex. 18.)

### D. March 22, 2010 Incident

On March 22, 2010, Hubbard was working the second shift on Work Order 7K35F0001, Prism Chagas Positive Calibrator, Lot 85893M501. The material being filled for that work order was a calibrator, which is a component of the kit used to screen blood and organ donors for the presence of antibodies to *T cruzi*, the causative agent of Chagas disease.[6] Hubbard began the pre-fill mixing operation at approximately 10:10 p.m.

Abbott's policies and procedures required Hubbard to use the equipment specified in the packaging bill of material and to verify that he was using the proper equipment.[7] Hubbard

---

[6] Chagas disease is a tropical parasitic disease caused by *T Cruzi*, which is commonly transmitted to humans and other mammals by insects or by blood transfusion. *See* "Chagas Disease," WebMD, http://www.webmd.com/a-to-z-guides/chagas-disease (visited Dec. 13, 2013).

[7] Hubbard rests many of his arguments in this case on the assertion that he did not select the filter that he used. (Dkt. 29 at 1-2.) Instead, Hubbard asserts that he was completing this job as a favor for a coworker, Abel Lopez, who went home sick that evening. After Lopez asked Hubbard to take over, Hubbard states that he received a phone call from an Inter Supervisor, Alex Long, who also asked Hubbard to stay at work and informed Hubbard that all necessary equipment was already set up on the table, and that "all [he] had to do was set it up for the Fill-O-Mastic machine." (*Id.*; *see also* Pl. N.D. Ill. L.R. 56.1 ¶ 40.) Hubbard states that Long reiterated to him that Lopez had already laid out all the

(continued...)

scanned the manufacturing equipment he was using and proceeded to run solution through the filter he was using to conduct a "filter integrity test." (Def. N.D. Ill. L.R. 56.1 ¶ 38.) Hubbard then requested approval for "pre-line clearance" from Angelo Munn, who was a CMO Production Specialist and the line supervisor on duty that night. Munn, however, did not provide Hubbard with the requested clearance. In the ensuring discussion between Hubbard and Munn, Munn told Hubbard that Hubbard was using an incorrect filter. Munn, who did not know at the time that Hubbard had already filtered the product using the incorrect filter,[8] told Hubbard that the filter tag did not match the filter required by the packaging bill of material and instructed Hubbard to notify someone of this. Hubbard thus called an outside line supervisor and coordinator, Julita Petrea. Petrea, who also did not know that Hubbard had already filtered the product with the incorrect filter,[9] told Hubbard to clean up the line and put the solution in the refrigerator. Hubbard then took down and cleaned all of the equipment, including the filter. The solution that Hubbard had already run through the incorrect filter was stored in the refrigerator. Hubbard and Munn both signed the product tracking sheet around midnight. (Dkt. 30, Exs. 5-6.)

---

(...continued)

necessary equipment. Thus, Hubbard blames his use of the wrong filter in large part on Lopez's prior error, which Long allegedly ratified. (*See, e.g.,* Pl. N.D. Ill. L.R. 56.1 ¶¶ 51-52.) In its response to Hubbard's statement of additional facts, Abbott only addresses those of Hubbard's statements for which he included a citation to record evidence. (*See* Dkt. 34.) To the extent that Abbott's response addresses these allegations regarding Lopez and Long, Abbott argues that the record cites are inapposite and the statements are not properly supported by evidence. (*Id.* ¶ 1.) The court agrees that Hubbard has either failed to support these allegations with any citation to the record or has cited portions of the record that do not bolster his claims.

[8] Hubbard asserts in his 56.1(b) that Munn was "fully aware" that Hubbard had already used the wrong filter. (Pl. N.D. Ill. L.R. 56.1 ¶ 41.) Hubbard provides no evidence for this statement in the form of a record cite, however. In the absence of support for this position, the court will not consider it.

[9] Again, Hubbard disputes this fact but provides no support for his position. (*See* Pl. N.D. Ill. L.R. 56.1 ¶ 42.)

The first shift coordinator to report for work the next morning noticed that the documentation left from the second shift indicated that the line set up for Work Order 7K35F0001 had been started and signed by Hubbard. Despite this, the line was not set up and all of the equipment had been sent back for cleaning and the solution was in refrigeration. Not realizing that the line had been taken down because there was a problem, the first shift operator re-set up the line, filtered the material, and continued to fill the material to complete the work order. Later that day during a review of the work order, however, it was discovered that (1) the documentation used to record filtration activities was missing from the work order; (2) the filter that Hubbard had scanned was not an approved filter for that work order; and (3) a significant amount of equipment had been scanned into the electronic work order that was not present in the morning, including pumps and tubing. Because it was discovered that the product had been filtered through an unapproved filter, it had to be destroyed.

### E. Investigation into the March 22, 2010 Incident

Hubbard's manager, Elizabeth Wernquist, a Second Shift Supervisor Fill/Label, learned of the irregularities relating to Hubbard's work order on March 23, 2010. When Hubbard arrived at work on March 23, Wernquist spoke with him about the work order and prepared a summary of the conversation. This summary states in part that "[Hubbard] had scanned in all the equipment and set the pumps," "[Hubbard] had removed the pumps from the line after setting them up," "[Hubbard] did not have solution in the pumps," "[Hubbard] had documented information on the missing A003 [work order documentation sheet], but he had a number of write overs/cross outs on the paperwork and had thrown it away," "[Hubbard] thought he could just re-print the A003, and that there was not an issue with him throwing it in the garbage," and

that "[Hubbard] had been very close . . . to filtering the material but had stopped just prior to filtering." (Def. N.D. Ill. L.R. 56.1 ¶ 54.) When Hubbard had this conversation with Wernquist, he understood that there was a question of whether some documentation from the previous night was missing. After this conversation, Wernquist contacted Abbott's Employee Relations Department ("ER") and reported on the potential product impact of Hubbard's filtering the solution through the incorrect filter. She also reported that Hubbard had intentionally destroyed documentation from the previous night. Wernquist provided ER a summary of her conversation with Hubbard.[10] Abbott thus assigned Quality and Regulatory Global Compliance Senior Compliance Auditor Guy Trussell as lead investigator of Hubbard's conduct and ER Manager Ken Mullen as ER witness to the investigation.

Trussell interviewed Hubbard on April 9, 2010. Mullen was present for the interview, and Trussell memorialized the conversation in his interview notes and investigation summary. Hubbard knew at the time of this interview that Trussell was investigating an allegation that Hubbard intentionally destroyed paperwork, which would be a violation of company policy and a terminable offense.[11] Trussell's interview notes reflect that Hubbard made admissions inconsistent with those documented by Wernquist, including that Hubbard, "grabbed the wrong filter," "did filter some of the solution," had "too many write overs," discarded documentation

---

[10] Hubbard states in his opposition memorandum that he "did not dispose [of] the [packaging bill of materials] paperwork such as the fill tape, scale tape, and the filter sheet because Mr. Munns was the last person with these items." (Dkt. 29 ¶ 6.) Hubbard presents no support for this statement, and the court will not consider it. It is also unclear to the court whether this paperwork is the same paperwork that Hubbard is accused of discarding, *i.e.*, the A003 form.

[11] Hubbard disagrees with this allegation, stating that he was unaware of the investigation and that, after his interview, he was "just sent home with pay." (Pl. N.D. Ill. L.R. 56.1 ¶ 62.) Without any support for this statement, the court again cannot consider it and instead accepts Abbott's allegation. *See Phillips*, 2012 WL 469966, at *1.

and potentially violated "good doc[ument] procedures." (Def. N.D. Ill. L.R. ¶ 60.) The summary also states that Hubbard discarded documentation because he was angry at himself for using the wrong filter despite knowing he should not have thrown this documentation away, and that Hubbard had processed the entire lot of product through an unapproved filter and returned the product to the refrigerator without notifying management of the error.[12]

Trussell's investigation also led him to interview Munn, Petrea, and Wernquist, with Mullen witnessing each interview. Munn told Trussell that on March 22, he noted to Hubbard that the filter tag did not match the filter required in the packaging bill of materials and told Hubbard he needed to report this to someone. Munn and Petrea both told Trussell that neither was aware that Hubbard had already filtered the product using the incorrect filter on the night of March 22.[13] Trussell concluded that Hubbard did not notify management of his error.[14] Hubbard does not allege that Trussell or Mullen made any statements related to his race or had other improper motives. Hubbard believes the investigation was not thoroughly completed but agrees that the most he alleges is that Trussell and Mullen "may have reached the wrong conclusion regarding Hubbard's conduct."[15] (*Id.* ¶ 67.)

---

[12] Hubbard asserts that Trussell took his statement and "twisted the statement words." (Pl. N.D. Ill. L.R. 56.1 ¶ 61.) Hubbard provides no support for this assertion, however, so the court must accept Abbott's statements as true. *See Phillips*, 2012 WL 469966, at *1.

[13] Again, Hubbard alleges that both were "fully aware of the situation on that night in question" but provides no support for this statement. (Pl. N.D. Ill. L.R. 56.1 ¶ 65.)

[14] Hubbard asserts that Munn and Petrea are members of management so by alerting them of the problem, he did alert management. Hubbard presents no evidence that Munn and Petrea qualify as "management." (Pl. N.D. Ill. L.R. 56.1 ¶ 66.)

[15] Hubbard alleges (again without support) that he was suspended with pay during the course of the investigation. (Dkt. 29 ¶ 8.) Abbott does not address this allegation outright but states that, "[t]o the extent that Hubbard is arguing that he was treated differently because he was suspended with pay while
(continued...)

### F.    Hubbard's Termination

Based on his investigation, Trussell believed that Hubbard knowingly discarded the

paperwork (the A003 form) that documented his processing of the batch through the wrong filter

without notifying anyone of this action.  Based on these findings, Mullen concluded that

Hubbard had violated Abbott's Code of Conduct, Section IV, Compliance with Abbott

Standards, Policies and Procedures, by intentionally destroying documentation, thereby

falsifying Abbott records.[16]  Mullen thus recommended that Hubbard be terminated.  This

decision was reviewed and approved by Senior Employee Relations Manager Laura Hennessey,

Employee Relations Director Sarah Schmit, Operations Manager David Rauch, and by

Wernquist.  Abbott thus terminated Hubbard's employment on April 17, 2010.

Hubbard admits that he never complained to Abbott's Human Resources Department that

he was being treated differently on account of his race.  He also admits that Wernquist, Trussell,

and Mullen never made any statements related to his race, and that Trussell or Mullen did not

have improper motives.  Rather, he alleges that Wernquist discriminated against him by

---

(...continued)
the investigation was pending, whereas the other individuals he alleges were treated more favorably were
allegedly allowed to continue working while their alleged investigations were pending, suspension with
pay is not an adverse employment action under Title VII."  (Dkt. 32 at 12 n.5.)  Insofar as this statement
constitutes an admission that Hubbard was suspended with pay, the court agrees it does not constitute an
"adverse employment action."  *See Myart* v. *Doubletree Hotels Corp.*, No. 01 C 4083, 2002 WL 63814,
at *5 (N.D. Ill. Jan. 17, 2002) ("[Plaintiff] cannot prove a *prima facie* case of retaliation based on the
suspension with pay."); *see also Teklehaimanot* v. *Park Ctr., Inc.*, 804 F. Supp. 2d 886, 905 (N.D. Ind.
2011); *but see Turner* v. *Marshall Field & Co.*, No. 97 C 6354, 1999 WL 168465, at *8 (N.D. Ill. Mar.
18, 1999) ("Although neither party cites to any case law regarding whether a suspension constitutes an
adverse action when an employee is ultimately reinstated and experiences no loss in pay, seniority or
benefits, the court finds that it could.").

[16] Hubbard asserts that he left his paperwork with Munns as instructed by Petrea on March 22,
2010.  (Pl. N.D. Ill. L.R. 56.1 ¶ 69.)

"look[ing] at him differently" and by treating him differently than other similarly situated employees who were not African-American, discussed below. *Id.*

### G. Other Abbott Employees

Hubbard points to Abbott employees whom he identifies as being similarly situated.[17] Hubbard identifies Paul Scott, a white male who was a Filler Operator Grade One Trainer. (Dkt. 25, Ex. 2 Hubbard Dep. at 18-20.) Scott had several incidents of missing paperwork and using incorrect filters from 2004 until 2008. (*Id.* at 21.) At the time of these incidents, Scott's supervisor was Teresa Gomez. (*Id.*) Scott was never accused of intentionally destroying paperwork. (*Id.* at 25.)

Hubbard also identifies Mike Mitch,[18] a white male who, like Hubbard, was a CMO Production Operator/Filler Operator. (Dkt. 29 ¶ 27.) Hubbard testified at his deposition that in 2009 and 2010, Mitch "made similar procedural errors" as Hubbard in that there was "missing paperwork," but Mitch was not suspended during the investigation. (Dkt. 25, Ex. 2 Hubbard Dep. at 19-20.) Wernquist was Mitch's supervisor at the time and Mitch worked on the same shift as Hubbard. (*Id.* at 20.) Hubbard learned of the missing paperwork at a meeting during which Wernquist stated that employees needed to be more careful about paperwork and that a

---

[17] Hubbard provides no documentary support for any of his allegations regarding these employees other than his statements about them in his opposition brief, which is not signed under penalty of perjury, thereby prohibiting the court from construing the brief as an "affidavit." *See, e.g., Pfeil* v. *Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) ("Affidavits are admissible in summary judgment proceedings if they are made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected."). The court will only consider these statements to the extent that they are supported by the record.

[18] While Hubbard spells his last name "Mitch," Abbott spells his last name "Mich." (*See* Dkt. 32 at 8.) For simplicity, the court will refer to him as "Mitch," as Hubbard does.

13

"misunderstanding" had occurred.  (*Id.*)  Mitch was never accused of intentionally destroying

paperwork or falsifying Abbott records.[19]  (*Id.* at 25; dkt. 33¶ 6.)

Both Hubbard and Abbott point to Carolyn Smith, a white female who was a CMO

Production Operator II (like Hubbard).  Wernquist was Smith's supervisor when Abbott

terminated Smith's employment in 2008 as the result of an investigation that concluded Smith

intentionally falsified documentation after committing an error and failing to notify management.

As Hubbard notes, however, 2008 was not the first time that Smith falsified documentation.

Smith's "Termination Review Sheet" reveals that in 2004 Smith "completed the competency

Assessment for another employee without the employee's presence," violating Abbott's Code of

Business Conduct.  (Dkt. 29, Ex. 17.)  Smith received a written warning for this incident.  (*Id.*)

At the time of the 2004 incident Wernquist was not Smith's supervisor.  (Dkt. 33 ¶¶ 2-3.)

Hubbard also states that Smith was not suspended while her actions were being investigated.

(Dkt. 29 ¶ 24.)  Smith was not terminated after the investigation but instead was re-trained and

stayed in the department.  (*Id.*)

## ANALYSIS

### I.    *Prima Facie* **Case of Race Discrimination**

Hubbard alleges that Abbott discriminated against him based on race in violation of Title

VII by terminating his employment.  Hubbard proceeds under the familiar indirect method of

proof set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d

---

[19] Hubbard identifies one other employee whom he alleges to be similarly situated, Scott Regency.  (*See* dkt. 29 ¶ 25.)  (Abbott spells his name Scott Regnery, not Regency.  (*See* dkt. 32 at 8.))  The court could find no mention of Scott Regency (or Scott Regnery) in the docket other than in the pleadings and in Wernquist's supplemental affidavit in which she explains that this employee never reported to her and she never played any role in any performance or disciplinary decisions related to him.  (Dkt. 33 ¶ 4.)  Accordingly, the court will not consider Regency/Regnery as a comparator.

668 (1973). Under this approach, to demonstrate a *prima facie* case of discrimination Hubbard must show that (1) he is a member of a protected class; (2) he was meeting Abbott's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Naficy* v. *Ill. Dep't. of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). If Hubbard establishes a *prima facie* case, Abbott must present evidence showing a legitimate, nondiscriminatory reason for the employment action. *Id.* Hubbard must then present evidence showing that Abbott's stated reason is pretextual. *Id.* at 511-12. "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Peele* v. *Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002) (quoting *Kulumani* v. *Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). The first and third elements are not disputed as Hubbard is African American and he suffered an adverse employment action when Abbott terminated his employment. *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).

### A.    Whether Hubbard Was Meeting Abbott's Legitimate Expectations

Abbott argues that Hubbard was not meeting its legitimate expectations at the time of his termination as evidenced by Hubbard's poor annual reviews demonstrating his unsatisfactory performance, culminating in his use of the wrong filter and intentional discarding of records. Hubbard does not contest any of the facts Abbott presents related to his history of performance. Instead, Hubbard takes issue with the findings of the investigation on which Abbott relied to terminate his employment.

Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining whether a plaintiff can make out a *prima facie* case,

15

where "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question [of] whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *see also Keeton* v. *Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012). Accordingly, whether Hubbard was meeting Abbott's employment expectations will be discussed in the pretext analysis below (Part II).

>   **B.     Whether Hubbard Can Identify Similarly Situated Employees Treated More Favorably**

   To make the *prima facie* showing, Hubbard must identify similarly situated employees outside of his protected class who were treated more favorably than he. The similarly situated employee inquiry, which calls for a "flexible, common-sense" approach, asks whether there are "enough common features between the individuals to allow [for] a meaningful comparison." *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (quoting *Humphries* v. *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008)). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal quotation marks omitted), they need not be "identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012).

   In order to show that an employee was similarly situated, Hubbard must demonstrate that the employee "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his/her] conduct or the employer's treatment of [him/her]." *Id.* at 847 (internal

quotation marks omitted).  As for the first prong, "[t]he similarly-situated requirement 'normally entails' the existence of a common supervisor," as the question is "whether [the similarly situated employees] were treated more favorably by the same decisionmaker." *Id.* at 848 (citation, internal quotation marks, and emphasis omitted).  Regarding the second prong, "[t]he question is not whether the employer classified the comparators in the same way, but whether the employer subjected them to different employment policies." *Id.* at 848 (internal quotation marks and citation omitted).  When analyzing the final prong of the similarly situated employee test, courts look to whether co-workers "'engaged in comparable rule or policy violations' and received more lenient discipline." *Id.* at 850 (internal quotation marks omitted).  "[T]he critical question is whether [the employees] have engaged in conduct of comparable seriousness.'" *Id.* at 851 (internal quotation marks omitted).  Hubbard identifies  Mike Mitch, Carolyn Smith, and Paul Scott, all of whom are white, as similarly situated employees.

       **i)**       **Mike Mitch**

Mitch held the same position as Hubbard (CMO Production Operator/Filler Operator) and thus was subject to the same standards.  Additionally, he was presumably also subject to Abbott's Code of Conduct.  (*See* Def. N.D. Ill. L.R. 56.1 ¶ 9 (noting that Hubbard was subject to Abbott's Code, "which sets forth certain core standards of conduct with which *Abbott employees must comply*") (emphasis added).)

Furthermore, at the time when Mitch was responsible for missing paperwork, Wernquist was Mitch's supervisor.  (Dkt. 25, Ex. 2 Hubbard Dep. at 20; dkt. 33 ¶ 6.)  This does not end the "common decisionmaker" inquiry, however.  The Seventh Circuit has explained that employees may be similarly situated even if they do not have the same direct supervisor because "the real

question is whether they were *treated more favorably* by the same *decisionmaker*." *Coleman*, 667 F.3d at 848 (emphasis in original) (internal quotation marks and citation omitted). In Hubbard's case, Wernquist notified ER of the March 22, 2010 events, Trussell investigated the allegations against Hubbard, Mullen recommended Hubbard for termination, and Hennessey, Schmit, Wernquist, and Rauch all approved the decision to terminate Hubbard. (Def. N.D. Ill. L.R. 56.1 ¶¶ 56-58, 68-71.) While both parties discussed Wernquist in listing the alleged comparators' relative similarities to Hubbard, neither discussed whether Trussell or Mullen played a role in investigating or disciplining Mitch (or, for that matter, Smith or Scott), or whether Hennessey, Schmit or Rauch were involved. Thus, the fact that Wernquist served as the direct supervisor for both Hubbard and Mitch is not determinative of whether Mitch is an appropriate comparator.

The final factor is whether the plaintiff and the comparator engaged in sufficiently similar misconduct. Abbott terminated Hubbard's employment after an internal investigation found that Hubbard knowingly discarded paperwork documenting his processing error related to Work Order 7K35F0001 and did not notify anyone of his error. (Def. N.D. Ill. L.R. 56.1 ¶ 68.) Mullen determined that Hubbard's actions violated Section VI of Abbott's Code (compliance with Abbott Standards, policies and procedures) when he intentionally destroyed documentation. (*Id.* ¶ 69.) This intentional destruction of paperwork qualified as falsifying Abbott records. (*Id.*) In addition, Hubbard's performance reviews had been declining. Although he continued to receive the overall mark of "Achieved Expectations," in 2007, 2008, and 2009, he received the lowest possible rating for "Quality/Compliance" in all three years (*Id.* ¶¶ 29-33.) He had

18

required over 40 corrections in 2007, many of which were related to paperwork errors.  In 2008

and 2009, Hubbard contributed to five non-conformances.  (*Id.*)

Mitch, however, was not accused of conduct of the same gravity.  Wernquist attests that

Mitch "was never involved in any investigation relating to intentional destruction of

documentation or falsifying Abbott records" during the time that Wernquist served as his

manager.  (Dkt. 33 ¶ 6.)  Hubbard also confirmed at his deposition that Mitch was never accused

of intentionally destroying any paperwork.  (Dkt. 25, Ex. 3, Hubbard Dep., at 25.)  Although

Hubbard asserts in his opposition brief that Mitch "misplaced and switched paperwork,"

Hubbard provides no support for this statement.  (Dkt. 29 ¶ 27.)  Nor does Hubbard allege that

Mitch's act was anything more than inadvertent error.[20]  For all of these reasons, Mitch is not a

suitable comparator.

---

[20]  Hubbard insists that his acts were in fact comparable to those of Mitch (and Scott, discussed in further detail below) because he only committed procedural errors and that he did not intentionally destroy paperwork.  (*See, e.g.,* Dkt. 25, Ex. 3, Hubbard Dep., at 25.)   But the question is not whether Abbott's investigation incorrectly led it to accuse Hubbard of more serious misconduct than that which he actually committed.  As discussed further in Part III below in the context of the pretext analysis, an employee who is terminated following an investigation into his conduct will not prevail simply by denying that he engaged in the conduct for which he was terminated and arguing that the employer did not conduct a thorough enough investigation.  *See, e.g., Dorado* v. *Dial Corp.*, No. 05 C 5627, 2007 WL 1052499, at *5 (N.D. Ill. Apr. 5, 2007) ("Dorado [who was dismissed for sexual harassment] simply denies that he sexually harassed his co-workers, argues that the women were lying, and alleges that [his employer] did not conduct a thorough enough investigation.  However, this is an insufficient rebuttal as 'the overall correctness or desirability of the reason proffered [for firing the plaintiff] is not relevant.'") (quoting *Baron* v. *City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999)); *see also Sidney* v. *Humana Health Care Plan, Inc.*, 10 F. Supp. 2d 1008, 1015 (N.D. Ill. 1998).

ii)     **Carolyn Smith**

Smith held the same position as Hubbard, CMO Production Operator/Filler Operator, and was thus subjected to the same standards. She was presumably also subject to Abbott's Code of Conduct. (*See* Def. N.D. Ill. L.R. 56.1 ¶ 9.) Moreover, the seriousness of Hubbard's conduct is comparable to that of Smith in 2004. As it did with Hubbard, Abbott also conducted an investigation into Smith's 2004 conduct and determined that she falsified records when she "completed the Competency Assessment for another employee without the employee's presence," violating Abbott's Code of Business Conduct. (Dkt. 29, Ex. 17.) But Wernquist was not Smith's supervisor when Smith received a written warning but was not terminated for falsifying documentation. (Dkt. 33 ¶ 7.) Instead, Wernquist was Smith's supervisor in 2008 when Abbott terminated Smith after an investigation concluded that Smith had also made an error and then falsified work order documentation to conceal the error and failed to notify management of the error. (Dkt. 31 ¶ 17.) Moreover, as discussed regarding Mitch, it is not apparent to the court whether any of the other individuals involved in firing Hubbard (Trussell, Mullen, Rauch, Hennessey, or Schmit) were involved in disciplining Smith in either 2004 or 2008. In fact, Smith's "Termination Review Worksheet" indicates that the ER case manager was Lety Padilla (who is not alleged to have participated in Hubbard's termination). (Dkt. 31, Ex. A.) Thus, while it may be moderately useful to compare Smith's 2008 conduct and subsequent treatment to Hubbard's conduct and termination based on comparable behavior and Wernquist's role, comparing Smith's 2004 conduct with Hubbard's is of little value. To the extent that the court compares her 2008 conduct to Hubbard's conduct, the court finds that Smith was not treated differently from Hubbard.

iii)    **Paul Scott**

Although Scott did not have the same title as Hubbard (Scott was a Filler Operator

Trainer) and Hubbard presents no evidence indicating that he and Scott were held to the same

standards, Abbott's statements indicate that Scott and Hubbard were both subject to Abbott's

Code of Business Conduct.  (Def. N.D. Ill. L.R. 56.1 ¶ 9 (emphasis added).)   Scott, however,

never directly reported to Wernquist, Hubbard's former manager, nor did Wernquist every play

any role in any performance or disciplinary decision relating to Scott.  (Dkt. 33 at ¶ 4.)  Like

with the other alleged comparators, neither party presents any information as to whether the

other Abbott employees involved in Hubbard's termination were also involved in disciplining

Scott.  Finally, the gravity of the accusations against Hubbard exceeds those against Scott.  Like

Mitch, Scott "had several incidents of missing paperwork and using alternative filters and

procedural errors on his work assignments."  (Dkt. 25, Ex. 3, Hubbard Dep. at 21.)  But unlike

Hubbard, Scott was not accused of intentionally destroying paperwork.  (*Id.* at 25.)  For all of

these reasons, Scott cannot serve as a comparator.

Thus, Hubbard has not met his burden of showing that Abbott employees who had the

same decisionmaker, were held to the same standards, and engaged in comparable conduct to

Hubbard were treated differently than he.  Accordingly, he has failed to state his *prima facie* case

of discrimination.

**III.    Whether Hubbard Can Establish Pretext**

Even if Hubbard had established his *prima facie* case, his suit would still fail because he

cannot demonstrate that Abbott's reason for his termination was pretextual.  To show pretext,

Hubbard must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and

(b) the employer's true reason was based on a discriminatory intent." *Perez* v. *Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quoting *E.E.O.C.* v. *Target Corp*., 460 F.3d 946, 960 (7th Cir. 2006)). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (brackets omitted)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan*, 518 F.3d at 492.

Abbott argues that it terminated Hubbard's employment after it conducted an investigation into the events of March 22, 2010 and determined in good faith that Hubbard had committed an error and then destroyed documentation to hide his mistake. Hubbard's main rebuttal is that the investigation itself was flawed. Other than stating in his deposition that Wernquist "maybe looked at [him] differently" and that it was "possible" that she occasionally did not take his questions seriously, he has no evidence of racial discrimination. (Dkt. 25, Ex. 3, Hubbard Dep., at 90.) He stated at his deposition that Wernquist never called him any derogatory names. (*Id.* at 89.) Hubbard also asserts in his opposition brief that Wernquist "showed cronyism, and favoritism and preferential treatment because of their race" but does not adequately support this statement.[21] (Dkt. 29 ¶ 29.) Nor does Hubbard allege that those Abbott

---

[21] To support this allegation Hubbard cites to Smith's "Termination Review Worksheet," which discusses the written warnings that Smith received from 1999 until 2007 and also includes Wernquist's description of the events leading up to her termination. (Dkt. 29, Ex. 17.) As discussed above, however, Wernquist served as Smith's supervisor beginning in May 2008, after which point the only entry on Smith's "Termination Review Worksheet" is the actual event that led to her termination. (*Id.*;

(continued...)

employees tasked with investigating his conduct, Trussell and Mullen, made any statements related to his race or otherwise had improper motives. (Def. N.D. Ill. L.R. 56.1 ¶ 67; Pl. N.D. Ill. L.R. 56.1 ¶ 67.) All he relies on to show racial discrimination is his vague allegation that he "sometimes got the impression that [Wernquist] liked [Hubbard] and sometimes [he] got the impression that she didn't like [him]." (*Id.* at 91.) These allegations do not demonstrate that Abbott's decision to terminate Hubbard's employment was pretextual.

Furthermore, Hubbard cannot show pretext simply by showing that Abbott's determination after its investigation into the March 22 incident was incorrect.[22] The Seventh Circuit "has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green* v. *Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999). Even if a company "may well have been mistaken in its beliefs about its employee and perhaps should have conducted a more thorough investigation," the employee will not prevail in demonstrating pretext unless he is able to demonstrate that his employer did not in good faith believe the reasons it provided for discharging him. *Id.*; *see also Biolchini* v. *Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999)

---

(...continued)

dkt. 33 ¶ 7.) Thus, any acts Abbott and its employees previously took regarding Smith do not demonstrate that Wernquist displayed "cronyism, and favoritism and preferential treatment." (Dkt. 29 ¶ 29.)

    [22] To succeed on such a claim, Hubbard would have had to show pretext by proving that Abbott's "professed reliance on the [investigation findings] was so unreasonable as to create the inference that [those Abbott employees responsible for firing Hubbard] subjectively did not believe the [investigation's] findings." *Little* v. *Illinois Dep't of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004). But unlike in *Little*, even reading Hubbard's complaint and allegations generously the court cannot find that he made such an allegation.

("[T]his court has noted that even where a plaintiff in a discrimination case alleges that the company's investigation was imprudent, ill-informed and inaccurate, summary judgment is appropriate unless the employee could point to facts suggesting that the company investigated [him] differently because [of race].") (internal quotation and citation omitted).

Hubbard argues that the conduct of Abbott employees regarding the March 22, 2010 events was flawed from the beginning. First, he argues that on the night of March 22, both Munns and Petrea knew that Hubbard had used the incorrect filter. (Pl. N.D. Ill. L.R. 56.1 ¶¶ 41-43.) He says that Trussell "twisted the statement" that Hubbard gave to him during the investigation. (*Id.* ¶ 61.) Hubbard contests Abbott's statement that Trussell concluded in good faith that Hubbard did not notify management of his error because Hubbard asserts that Munns and Petrea qualify as management. (*Id.* ¶ 66.) He also contends that Trussell and Mullen did not interview everyone involved in the March 22 events and that Mullen's recommendation to fire Hubbard was "based on not all the facts." (*Id.* ¶¶ 70-71.)

These allegations fail to demonstrate pretext for two reasons. First, as discussed above, Hubbard provides no record evidence for any of his statements and many of them conflict with evidence in the record. Second, even if the court were to consider them, they do not show any more than investigative error. Accordingly, they do not demonstrate pretext. The argument that Abbott's "investigation was so shoddy as to give rise to an inference of discriminatory intent" is a "nonstarter." *Little* v. *Illinois Dep't of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004).

Hubbard also does not rebut Abbott's argument that Hubbard was not performing adequately. As discussed, Hubbard's performance reviews were middling but declining. (*See* Dkt. 25, Ex. 2, Hubbard Dep. Exs. 13-18.) In the face of Hubbard's declining performance

combined with the good-faith determination by Abbott's investigators that Hubbard had used the incorrect filter and then discarded documentation to cover up for his mistake, it was reasonable for Abbott to terminate his employment.

In short, Hubbard has failed to carry his burden of demonstrating that he was meeting Abbott's legitimate expectations or that similarly situated employees were treated differently for comparable conduct. Nor does he present sufficient evidence of pretext to call the honesty of Abbott's reasons for termination into question. Accordingly, Abbott's motion for summary judgment is granted.

## ORDER

The defendant's motion for summary judgment is granted. This case is terminated.

Date:   December 13, 2013

U.S. District Judge Joan H. Lefkow